## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

JAMES WEST,

                    Plaintiff,

v.                                                          No. Civ. 06-994 LH/WDS

CITY OF SANTA ROSA,
SANTA ROSA POLICE DEPARTMENT,
JEREMY ROMERO, in his individual and
official capacity, and MICHAEL GAUNA,
in his individual and official capacity,

                    Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Motion for Summary Judgment (Doc. 36),

filed by Defendants City of Santa Rosa, Santa Rosa Police Department, Jeremy Romero, and

Michael Gauna (collectively, "Defendants") on June 1, 2007.   The Court, having considered the

motions, responsive briefs, evidence, and applicable law, concludes that Defendants' motion should

be granted in part and denied in part.

## I.      FACTUAL BACKGROUND[1]

Plaintiff James West ("Plaintiff") is a Vietnam veteran who has been declared 100% disabled

because of Post-Traumatic Stress Disorder ("PTSD").   *See* Pl.'s Resp. to Defs.' Mot. for Summ. J.

(Doc. 39, filed June 22, 2007) ("Pl.'s Resp."), Ex. 8 at 0012.   Symptoms of PTSD include gross

impairment in thought processes or communication, persistent delusions or hallucinations, and

---

[1]The following facts are those construed in the light most favorable to Plaintiff.
Although Defendants have submitted evidence that disputes some of the following facts, at this
stage in the proceedings, the Court must construe factual disputes in Plaintiff's favor.

disorientation to time or place.  *See id.*

On January 3, 2006, Plaintiff, while traveling to Florida, stopped in Santa Rosa, New Mexico, to spend the night.  Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J. (Doc. 37, filed June 1, 2007) ("Defs.' Mem."), Undisputed Fact ("UF") ¶ 1.  Plaintiff ate dinner in his hotel room and had two small Dixie cups of wine.  Defs.' Mem., UF ¶ 2; Pl.'s Resp., Ex. 1 at 29.  Plaintiff left his hotel later that evening and drove to Alsup's convenience store in search of a cigar.  *See* Defs.' Mem., UF ¶ 3; Pl.'s Resp., Ex. 7, ¶ 4.  Because the Alsup's store did not have the type of cigar he wanted, Plaintiff went to the Shell convenience store.  Pl.'s Resp., Ex. 7, ¶¶ 4-5.  After not finding the cigar he wanted, Plaintiff left the Shell station in his car.  *Id.*, Ex. 7, ¶¶ 5-6.  As he pulled out of the Shell station onto Route 66, there were no on-coming vehicles in the right lane.  *Id.*, Ex. 7, ¶ 6. He entered Route 66 with his vehicle entirely in the right lane.  *Id.*  No cars passed him while he was making the turn.  *Id.*

Shortly after Plaintiff entered Route 66, Defendant Romero, a police officer with the City of Santa Rosa ("the City"), pulled behind Plaintiff's vehicle and made a traffic stop on Route 66 into the Pizza Hut parking lot.  *See* Defs.' Mem., UF ¶ 7 & Ex. 1 at 62; Pl.'s Resp., Ex. 7, ¶ 7.[2]

---

[2]Defendant Romero asserts in his deposition that he stopped Plaintiff because he received a dispatch over the radio that an off-duty police officer with the City, Anthony Salas, reported that a male subject stumbled into Alsup's, asked for the strongest alcohol at the store, left the store without any alcohol, and got into his red BMW with an Arizona license plate.  *See* Defs.' Mem., Ex. 1 at 51, 54, 57, and 58.  Defendant Romero also contends that he observed Plaintiff's vehicle, which matched the description Officer Salas gave, exit westward out of the Shell station, pause between the slow and fast lanes, so that it was sideways in both lanes of traffic, as if parked, causing another vehicle to move into the median area to avoid a collision.  *See id.*, Ex. 1 at 62-63.

Defendant Romero's police report, however, says only that he stopped Plaintiff because he almost caused a collision.  *See id.*, Ex. 3.  The report says nothing about any conversation with or dispatch from Officer Salas.  *See id.*  Santa Rosa Police Department never obtained a written statement from Officer Salas concerning this event, although Officer Salas remained

Defendant Gauna was in his vehicle at the Pizza Hut parking lot during the traffic stop. Pl.'s Resp., Ex. 3 at 11. Defendant Romero requested Plaintiff's driver's license, registration, and proof of insurance. Defs.' Mem., Ex. 1 at 114-15. Plaintiff appeared confused as to what Defendant Romero was asking him and had a difficult time providing the information. *Id.* Plaintiff fumbled through his wallet and seemed to be talking to himself, as if he did not understand what Defendant Romero was telling him. *Id.*

Defendant Romero told Plaintiff that he stopped him because he had a taillight out. Pl.'s Resp., Ex. 1 at 34. Plaintiff's taillight, however, was working. *See id.* Defendant Romero did not at any time that night tell Plaintiff that the reason he was pulled over was because he almost caused an accident or collision with another vehicle. *See id.*, Ex. 7, ¶ 7. Defendant Romero observed that Plaintiff's eyes were bloodshot and watery and his speech was slurred. Def.'s Mem., Ex. 1 at 115. He also detected an odor of alcohol on Plaintiff's breath as he spoke to him. *Id.*, Ex. 1 at 114. Plaintiff explained to him that his eyes were tired because he had been driving 12 hours that day. Pl.'s Resp., Ex. 1 at 60. As for his speech, Plaintiff has spoken with a slur for as long as he can remember, and he left his dentures in his motel room that night. *See id.*, Ex. 7, ¶ 2 & Ex. 1 at 79.

---

employed with the department for nearly one year after this incident. *See* Pl.'s Resp., Ex. 11 at 5-6. The radio dispatch log from January 3, 2006, at the time of the incident, does not reflect any call received by dispatch from Officer Salas. *See* Pl.'s Resp., Ex. 2 & Ex. 4 at 54-57. The log, however, does indicate that Officer Salas may have been with Officer Romero at the Pizza Hut. *See id.*, Ex. 2 & Def.'s Mem., Ex. 1 at 57-58.

Plaintiff has submitted evidence that refutes Defendant Romero's version of events and from which an inference could be made that Officer Salas never called into dispatch concerning Plaintiff. Because this Court must resolve factual disputes and reasonable inferences in the non-moving party's favor at the summary judgment stage, the Court will, for purposes of this opinion, presume as true the inference that Officer Salas did not relay any reports concerning Plaintiff to either Defendant Romero or Defendant Gauna on January 3, 2006. The Court will leave the credibility determinations for a jury.

Plaintiff told Defendant Romero that he had a small amount of wine with dinner, *see* Defs.' Mem., Ex. 1 at 115, but he asserts that he could not have smelled of alcohol after only two small Dixie cups of wine. *See* Pl.'s Resp. at 5. Defendant Romero told Plaintiff that it was illegal to drive in New Mexico no matter how much you have had to drink and asked Plaintiff to step out of the vehicle. *See id.*, Ex. 1 at 36.

Defendant Romero asked Plaintiff to perform four field sobriety tests ("FSTs"): the horizontal gaze nystagmus, walk-and-turn, one-leg stand, and finger count tests. Defs.' Mem., Ex. 3. Plaintiff believes he passed all the tests except for the walk-and-turn test. *See* Pl.'s Resp., Ex. 1 at 36. Plaintiff's leg was cramping due to the long drive, which he told Defendant Romero. *See id.* He also had difficulty performing well on this test because it was windy, dark, and cold, and the parking lot was sloped and rocky. *See id.*, Ex. 1 at 121 & Ex. 10.

Prior to administering the FSTs, Defendant Romero handed Defendant Gauna the documents he received from Plaintiff. *See* Defs.' Mem., UF ¶ 12; Pl.'s Resp., Ex. 3 at 11. While Defendant Romero conducted the FSTs, Defendant Gauna radioed to dispatch and relayed Plaintiff's license plate number and driver's license information to run a routine NCIC check. *See* Defs.' Mem., UF ¶ 12; Pl.'s Resp., Ex. 3 at 11-12. Defendant Gauna did not see Defendant Romero conduct any of the FSTs on Plaintiff. Pl.'s Resp., Ex. 3 at 11-12.

Based on his investigation, including what he perceived was Plaintiff's poor performance on the FSTs, Defendant Romero arrested Plaintiff for driving under the influence of intoxicating alcohol or drugs. *See* Defs.' Mem., Ex. 3 at 3-4. He advised Plaintiff that he was under arrest and placed him in the back of the patrol car. *Id.*, Ex. 3 at 4. Neither Defendant Romero nor any other

officer advised Plaintiff of his *Miranda*[3] rights at any time that night.  Pl.'s Resp., Ex. 7, ¶ 8.

While Defendant Romero transported Plaintiff to the station, Defendant Gauna conducted an inventory of Plaintiff's car.  Defs.' Mem., Ex. 2 at 33.  The Santa Rosa Police Department's ("SRPD") Standard Operating Procedures ("SOPs") in place at the time of the incident provide that a person can only search an arrestee's property with a search warrant or the written consent of the arrestee.  *See* Pl.'s Resp., Ex. 11 at 44.  During the inventory, Defendant Gauna observed a medication bottle in Plaintiff's car.  *See* Defs.' Mem., Ex. 2 at 35-36.  Although he did not read the label, he noticed what he claims was a symbol of a wine glass on the medication, which he assumed meant that Plaintiff should not mix the medication with alcohol.  *See id.*  However, on January 3, 2006, Plaintiff was only taking medications for high blood pressure, hydrochlorothiazide and nifedipine.  Pl.'s Resp., Ex. 7, ¶ 10.  These high blood pressure medications did not contain any warnings against ingesting alcohol while using the medications or contain any depictions of a wine glass.  *See* Pl.'s Resp., Ex. 1 at 17-18 & Ex. 9.  The bottle of nifedipine did warn against ingesting grapefruit juice while on the medication, because the juice would increase absorption of the drug, but it did not have a wine glass on it or warn against ingesting alcohol.  *See id.*

Plaintiff told Defendant Romero and Defendant Gauna that he was taking medications for high blood pressure.  *See id.*, Ex. 7, ¶ 10.  Plaintiff never told any SRPD officer that he suffered from PTSD or that he was taking psychiatric medications.  *Id.*, Ex. 7, ¶ 9.  Plaintiff, in fact, was not taking any psychiatric medications on January 3, 2006.  *Id.*, Ex. 7, ¶ 10.

After arriving at the police station, Defendant Romero advised Plaintiff of his rights under

---

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).  *Miranda* warnings are required for custodial interrogation, but not for questioning during an investigative detention.  *Cortez v. McCauley*, 478 F.3d 1108, 1113 n.2 (10th Cir. 2007).

the New Mexico Implied Consent Act,[4] after which Plaintiff agreed to take the breath test.  *See*

Def.'s Mem., Ex. 3 at 4.[5]  Defendant Gauna administered the breath test to Plaintiff, the result of

which was a 0.026.  *Id.*, UF ¶ 19.  Defendant Romero and Defendant Gauna discussed the results

and determined that a blood test was necessary to test for drugs.  *See id.*, Ex. 1 at 76 & Ex. 2 at 26-

27.  Although Plaintiff had told the officers that he was taking medications for high blood pressure,

neither officer knew the exact medication he was taking or the effects or consequences of the

medications Plaintiff was taking.  *See* Pl.'s Resp., Ex. 3 at 32 & Ex. 4 at 30-31.  Nor did they know

whether the particular medications he was taking had any influence on his ability to drive.  *See id.*

Defendant Romero pushed Plaintiff out the back of the station and into a police car.  *See id.*,

Ex. 1 at 49-50.  He then drove Plaintiff to the Guadalupe County Hospital for a blood test.  *See*

Defs.' Mem., Ex. 4 at 3; Pl.'s Resp., Ex. 1 at 49-50.  Plaintiff asked repeatedly why they were taking

him to the hospital, to which Officer Romero replied, "We need more tests."  *See* Pl.'s Resp., Ex.

1 at 50.  Plaintiff asked him what the result was of his breath test, but Defendant Romero responded

that he did not know but he needed his blood now.  *See id.*, Ex. 1 at 51.  At the hospital, Plaintiff was

---

[4]The New Mexico Implied Consent Act is contained within NMSA §§ 66-8-105 through 66-8-112.  The Act provides that any person who operates a motor vehicle within New Mexico shall be deemed to have given consent to chemical tests of his breath or blood or both, as determined by a law enforcement officer who has reasonable grounds to believe the person to have been driving a motor vehicle while under the influence of intoxicating liquor or drug.  *See* NMSA § 66-8-107(A) & (B).  The Act further provides that the person tested shall be advised by the officer of the person's right to have an opportunity to arrange for a chemical test by any qualified person of his choosing.  *See* NMSA § 66-8-109(B).

[5]Plaintiff disputes this fact, but cites no evidence to contest it.  Instead, Plaintiff argues against relying on Defendants' Exhibit 4, an audio recording transcript, on various grounds.  Plaintiff, however, does not assert that the Court should not rely on Defendants' Exhibit 3.  Because Defendants' Exhibit 3 supports the factual allegation that Defendant Romero advised Plaintiff of the New Mexico Implied Consent Act at the station and Plaintiff agreed to take the breath test, the Court does not need to resolve whether or not Exhibit 4 is admissible evidence.

presented with a consent form and told that if he did not sign it, the judge would think he was trying to hide something, and that if he wanted to get out of this, he would sign it.  *See id.*, Ex. 1 at 52. Plaintiff then asked a nurse whether this was okay and if it were normal, and she responded to just sign it and not to worry about it.  *Id.*, Ex. 1 at 53.  Plaintiff signed the consent form because he thought that, by cooperating, they were going to let him go and because he did not have anything to hide.  *See id.*  The consent form stated:  "Let my signature state I have given consent for these blood samples to be taken."  Defs.' Mem., Ex. 5.

Following the blood draw, Defendant Gauna transported Plaintiff to the Guadalupe County Correctional Facility.  Defs.' Mem., UF ¶ 24.  Plaintiff did not state that he needed his medications to Defendant Gauna at any time that night.  *Id.*  At the correctional facility, Plaintiff was given his blood pressure medication.  Defs.' Mem., UF ¶ 25.  Following his release, the employees of the correctional facility did not return his medication to him.  *See id.*

Defendant Romero issued Plaintiff a Notice of Revocation of his driver's license.  *See* Pl.'s Resp., Ex. 13.  SRPD officers, however, are not authorized to give a citizen a notice of revocation where a citizen's blood alcohol level ("BAL") is a 0.026 and where the officer does not have the results of a blood test to support an inference of being under the influence of drugs.  *See* Pl.'s Resp., Ex. 11 at 59.  A Notice of Revocation would not effect Plaintiff because he is not a resident of New Mexico.  *See id.*, Ex. 4 at 116.  Defendant Romero does not know why he gave Plaintiff a Notice of Revocation when it would have no effect on him.  *See id.*  Defendant Romero also issued Plaintiff a citation for driving under the influence of alcohol or drugs and for careless driving.  See Defs.' Mem., Ex. 3 at 4.

The blood sample was forwarded to the Scientific Laboratory Division ("SLD") in

Albuquerque for testing.  Defs.' Mem., UF ¶ 23.  On February 3, 2006, Defendant Romero received

the results of the blood test, which showed that Plaintiff's BAL was 0.01.  *See id.*, Ex. 3 at 6.  The

SLD also tested Plaintiff's blood sample for numerous types of drugs, including opiates,

methamphetamine, cocaine metabolite, cannabinoids, benzodiazepines, PCP, anticonvulsants,

antidepressants, antihistamines, narcotic analgesics, and psychedelics.  *See* Pl.'s Resp., Ex. 12.  No

drugs were detected.  *Id.*  On February 23, 2006, the charges against Plaintiff were dismissed.  *See*

Defs.' Mem., UF ¶ 26.

   Since January 3, 2006, Plaintiff has not seen any medical provider nor gone to any veteran

center for any treatment for PTSD.  *See* Def.'s Mem., Ex. 6 at 91, 101-02.

   Jesus Roybal, the police chief of the SRPD at the time of the incident, is not aware of any

arrests made by SRPD officers of any other citizen who blew a BAL of 0.03 or below between 2002

and April 2007.  *See* Pl.'s Resp., Ex. 11 at 47.  Chief Roybal also is not aware of any other

circumstance in which a person blew a 0.026 and was taken to be blood tested by an SRPD officer.

*See* Pl.'s Resp., Ex. 11 at 106.  Defendant Gauna similarly did not know of any individual, prior to

January 2006, who blew a 0.025 to a 0.033 on a breath test and was arrested.  *See id.*, Ex. 3 at 26.

Neither Defendant Romero nor Defendant Gauna were aware at the time of the incident that a person

who blows a 0.04 or below on a breath test is presumed by NMSA § 66-8-110 to not be under the

influence of intoxicating liquor.  *See id.*, Ex. 3 at 7 & Ex. 4 at 15-18.

   During the time in which Jesus Roybal was police chief, the SRPD did not provide any in-

house, formal, ongoing training programs.  *See id.*, Ex. 11 at 28-29.  SRPD officers are required,

however, to obtain 40 hours of training classes every two years in order to keep their certifications

valid.  *See* Defs.' Mem., Ex. 2 at 16-17.  The Department of Public Safety academy conducts these

classes.  *See id.*  Corporal Ernesto Pacheco was in charge of training to ensure that each SRPD officer completed the requisite 40 hours of refresher training.  *See* Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J.(Doc. 43) ("Defs.' Reply"), Ex. 7 at 29, 71.  At the end of 2006, the State of New Mexico began mandating that every officer complete an annual DWI field sobriety refresher training.  *See id.*, Ex. 7 at 69-70.

In July 2002, Defendant Gauna attended and completed a five-hour course from the Federal Law Enforcement Training Center on drug recognition that taught how to identify illegal drugs and recognize the signs of illegal drug use.  *See* Defs.' Mem., Ex. 2 at 45-46.  In May 2004, he attended a symposium entitled "Prosecuting DWI and Other Misdemeanors," which explained how to deal with a DWI situation and provided updates on new procedures in DWI enforcement.  *See id.*, Ex. 2 at 48.  Although he was the core coordinator for the DWI program for the SRPD, *see* Pl.'s Resp., Ex. 11 at 72, Defendant Gauna did not conduct any training because he was not a Certified Training Officer with the department, *see id.*, Ex. 3 at 67.

Defendant Romero received civil rights training at the police academy.  *See* Defs.' Mem., Ex. 1 at 85.  In July 2004, he successfully completed training in DWI Standardized Field Sobriety Testing, in which he received classroom training in the area of DWI testing and field training in testing subjects to detect their level of sobriety.  *See id.*, Ex. 1 at 84.  In March 2005, he received federal civil rights training and interview and interrogation training from the Federal Bureau of Investigation.  *See id.*, Ex. 1 at 84-85.  Since he became a patrolman with SRPD, however, he has received no other training with regard to making DWI arrests.  Pl.'s Resp., Ex. 4 at 10.

## II.    PROCEDURAL HISTORY

Plaintiff filed a complaint for damages that alleges the following causes of action: (I)

unlawful seizure in violation of the Fourth Amendment, (II) excessive force in violation of the Fourth Amendment, (III) false imprisonment in violation of substantive due process, (IV) violation of *Miranda* rights under the Fifth Amendment, (V) violation of Fourteenth Amendment substantive due process, (VI) failure to provide medical treatment in violation of the Eighth Amendment, (VII) negligent supervision and training by SRPD and the City, and (VII) false imprisonment, false arrest, assault, and battery under the New Mexico Tort Claims Act.  Plaintiff brought claims against Defendant Romero and Defendant Gauna in their individual and official capacities.

Defendants filed a motion for summary judgment (Doc. 36) on June 1, 2007.  Defendants argue that Officers Romero and Gauna are entitled to qualified immunity on Plaintiff's Fourth, Fifth, Eighth, and Fourteenth Amendment claims and the City is entitled to summary judgment on Plaintiff's municipal liability claim.

## III.    STANDARD

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful.  *Saucier v. Katz*, 533 U.S. 194, 206 (2001).  When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test.  *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).  The plaintiff must demonstrate that (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the

time of the conduct.  *Id.*  As to the first inquiry, the question is whether the facts alleged, which are taken in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).  The second inquiry is more specific than whether the officer's conduct violated a constitutional right; the question is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances he confronted.  *Saucier*, 533 U.S. at 202.  Furthermore, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

If the plaintiff establishes both elements of the qualified immunity test, then the burden shifts back to the defendant to show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.  *Nelson*, 207 F.3d at 1206.  Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party."  *Id.* (internal quotations omitted).  Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  *Id.* at 248.

IV.   **DISCUSSION**

A.   **Fourth Amendment Claims**

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const., amend. IV.  Plaintiff alleges two causes of action under the Fourth Amendment: unlawful seizure (Count I) and use of excessive force (Count II).

1.   **Unlawful Seizure**

Plaintiff contends in Count I that the actions of Defendants in stopping, detaining, arresting, and forcing him to submit to breath and blood tests constituted an unlawful seizure in violation of the Fourth Amendment.

a.   **Detention and arrest**

A traffic stop is a seizure that is treated as an investigative detention.  *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995).  An investigative detention is an exception to the probable cause requirement.  *See Terry v. Ohio*, 392 U.S. 1, 26 (1968).  "An officer 'can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.'" *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)).  An officer has reasonable suspicion to justify the detention if he has a particularized and objective basis for suspecting the person stopped of criminal activity.  *Id.*  To determine whether an investigative detention is reasonable, the court must determine (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope

to the circumstances that justified the interference in the first place. *See Terry*, 392 U.S. at 19-20; *Botero-Ospina*, 71 F.3d at 786.

A police officer violates a citizen's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause. *Olsen*, 312 F.3d at 1312. An arrest is distinguished from an investigative detention by the highly intrusive and forceful nature of the encounter. *See Cortez*, 478 F.3d at 1115-16. Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent man to believe that the suspect has committed or was committing an offense. *Beck v. Ohio*, 379 U.S.89, 91 (1964); *Olsen*, 312 F.3d at 1312. "[I]n determining whether probable cause exists, the courts must apply the 'totality of circumstances' test." *Brierley v. Schoenfeld,* 781 F.2d 838, 841 n.1 (10th Cir. 1986) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). In the qualified immunity context, a defendant is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991); *Olsen*, 312 F.3d at 1312. Law enforcement officers who reasonably but mistakenly conclude that probable cause is present are also entitled to qualified immunity. *Hunter*, 502 U.S. at 227. Where there are unresolved disputes of fact as to whether the officer had probable cause and to what information he possessed, a court may not grant summary judgment based on qualified immunity. *See Olsen*, 312 F.3d at 1312-13.

Defendants argue that Officer Romero had reasonable suspicion to stop Plaintiff based on Officer Salas' report to him that he observed Plaintiff seeking liquor and stumbling as he left the store and his own observation of Plaintiff driving carelessly and almost causing a collision with another vehicle. Defendants contend that the following additional facts, discovered during the course of Officer Romero's investigative detention, established probable cause to arrest Plaintiff for

DWI:  Officer Romero detected the odor of alcohol on Plaintiff's breath; Plaintiff's eyes were bloodshot and watery; his speech was slurred; he appeared confused and was talking to himself; he admitted to drinking some wine with dinner; Plaintiff failed the FSTs; Officer Gauna saw a medication bottle in Plaintiff's vehicle with a wine glass symbol on it that he took to mean the medication should not be mixed with alcohol; Plaintiff told Officer Romero that he took pills for high blood pressure and psychiatric medication; and Plaintiff told Officer Guana he had PTSD.

The problem with Defendants' argument, however, is that at this stage in the proceedings the Court must look at the evidence and all inferences to be drawn therefrom in favor of the non-moving party.  Although Defendants' version of the facts may be sufficient to establish reasonable suspicion to detain and then probable cause to arrest Plaintiff, the Court cannot rely solely on Defendants' version of events at the summary judgment stage.  Plaintiff has disputed the aforementioned facts with admissible evidence, and thus, the Court must examine whether Defendant Romero unlawfully seized Plaintiff by construing the evidence in the light most favorable to Plaintiff.

The evidence submitted by Plaintiff tells a markedly different story.  Plaintiff has provided evidence that he did not stumble into a convenience store seeking liquor, that he did not drive in a careless manner, and that his taillights were operating properly.  He also submitted evidence indicating that Officer Salas may not have relayed any reports concerning Plaintiff to either Defendant Romero or Defendant Gauna on January 3, 2006.  Moreover, Plaintiff's evidence also indicates that, once stopped, he performed well on most of the FSTs, one of which was difficult to perform due to the conditions, and that he explained to Defendant Romero that he had drunk only two small Dixie cups of wine, that his eyes were bloodshot and watery because he had been driving

12 hours that day, and that he spoke with a slur for as long as he can remember and he left his dentures in his motel room.  It is undisputed that the result of Plaintiff's breath test was only a 0.026 BAL.  It is similarly undisputed that Plaintiff's blood tests revealed a 0.01 BAL and were negative for drugs.  Plaintiff also testified that he told Defendant Romero and Defendant Gauna that he was taking medications for high blood pressure, but that he never told them that he suffered from PTSD or that he was taking psychiatric medications.  No evidence of drug use, other than his high blood pressure medications, was found in Plaintiff's car.  Considering all the facts in the light most favorable to Plaintiff, Defendant Romero would not have had reasonable suspicion to stop Plaintiff for any crime or traffic infraction, nor would he have had probable cause to arrest Plaintiff for DWI. Plaintiff's version of the facts, if believed, would thus establish a Fourth Amendment violation.

This conclusion, however, does not end the qualified immunity analysis.  The Court must also determine whether the right was clearly established at the time the alleged violation occurred. The law was clear at the time of the alleged offense in this case that stopping a citizen who did not commit any traffic violation or crime violated the Fourth Amendment.  *See Terry*, 392 U.S. at 19-20. It was also clearly established at the time that an officer violates a citizen's Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause. *See Olsen*, 312 F.3d at 1312.  Taking the facts in the light most favorable to Plaintiff, Plaintiff did not show any signs of impaired driving, he performed well on the FSTs, his breath and blood tests showed an alcohol concentration in the range of the statutory presumption that he was not impaired, and the only evidence of drug use was that he was taking high blood pressure medications.  Under these facts, a reasonable officer could not have believed that reasonable suspicion existed to detain or probable cause existed to arrest Plaintiff.  The Court must therefore deny Defendants' motion for

summary judgment based on qualified immunity as to the unlawful seizure cause of action alleged in Count I.  *See Olsen*, 312 F.3d at 1312 ("When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied.") (internal quotations omitted).

### b.    Warrantless Blood Test

It is also clearly established that blood tests constitute searches under the Fourth Amendment.  *Marshall v. Columbia Lea Regional Hospital*, 474 F.3d 733, 740 (10th Cir. 2007) ("*Marshall II*").  State actors administering a blood test without a warrant or consent thus may be subject to suit under § 1983 for violation of the Fourth Amendment.  *See Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157, 1171 (10th Cir. 2003) ("*Marshall I*").  "[A] warrantless blood test, performed without consent, is presumptively unreasonable unless the state actors involved had probable cause and exigent circumstances sufficient to justify it."  *Marshall I*, 345 F.3d at 1172. Exigent circumstances are measured in part by the relative importance given by state law to the evidence sought through the warrantless search.  *Id.* at 1175.  "[E]xigent circumstances exist only when a warrant would be available but for the shortage of time."  *Id.* at 1176.  New Mexico state law does not authorize New Mexico police to compel a blood test in a misdemeanor case involving no physical injury, even with a warrant.  *See* NMSA § 66-8-111; *Marshall I*, 345 F.3d at 1173.  Exigent circumstances therefore cannot justify a non-consensual warrantless blood test to search for evidence of a misdemeanor DWI offense in New Mexico, even if there is probable cause to believe the suspect committed the offense.  *See Marshall I*, 345 F.3d at 1172-76.  The Tenth Circuit has concluded that this law was clearly established as far back as 1996.  *See Marshall II*, 474 F.3d at 740-46.

16

In this case, Defendants assert that Officer Romero had Plaintiff undergo a warrantless blood test because he suspected that Plaintiff committed a misdemeanor DWI offense.  Because exigent circumstances cannot justify a blood test under these circumstances, the blood test would have violated Plaintiff's Fourth Amendment unless Plaintiff consented to the test.  The Court must therefore determine whether Plaintiff gave consent for the test.

A search pursuant to consent does not violate the Fourth Amendment.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  In order to justify a search on the basis of consent, the Fourth Amendment requires the government to demonstrate that the consent was voluntarily given and not the result of duress or coercion, express or implied.  *See id.* at 248.  Consent is voluntary if is it the product of an essentially free and unconstrained choice, and not the product of an overborne will.  *See id.* at 225-26.  "Whether a search is consensual is a question of fact to be determined by the totality of the circumstances."  *Marshall*, 345 F.3d at 1177.  Factors include the details of the interrogation and the characteristics of the accused, such as youth, lack of education, low intelligence; the lack of advice of constitutional rights; the repeated and prolonged nature of the questioning; and the use of physical punishment, promises, inducements, deception, or trickery.  *See Schneckloth*, 412 U.S. at 226; *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998)).  "An officer's request for consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.'"  *Pena*, 143 F.3d at 1367 (citing *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994)).

The following facts, construed in the light most favorable to Plaintiff, bear on the issue of voluntariness.  After arriving at the police station, Defendant Romero advised Plaintiff of his rights under the New Mexico Implied Consent Act, after which Plaintiff agreed to take the breath test.

17

Although Plaintiff's breath test registered a 0.026 BAL, Defendant Romero and Defendant Gauna decided to have a blood test done.  Defendant Romero pushed Plaintiff out the back of the station and into a police car and then drove him to the hospital.  Although Plaintiff repeatedly asked why they were taking him to the hospital, Defendant Romero simply replied, "We need more tests." When Plaintiff inquired what the results of his breath test were, Defendant Romero said he did not know but that they needed his blood now.  Once at the hospital, Plaintiff was presented with a consent form, which read, "Let my signature state I have given consent for these blood samples to be taken."  Plaintiff was told that if he did not sign it, the judge would think he was trying to hide something, and that if Plaintiff wanted to get out of this, he would sign it.  Plaintiff then asked a nurse whether this was okay and if it were normal, and she responded to just sign it and not to worry about it.  Plaintiff signed the consent form because he thought that, by cooperating, they were going to let him go and because he did not have anything to hide.

Based on these facts, the Court concludes that Plaintiff cannot demonstrate that his consent was involuntary as a matter of law.  The facts do not show that Plaintiff's will was overborne.  As Plaintiff himself admits, he signed the consent form because he knew he had nothing to hide and he thought that his cooperation would compel them to let him go.  Under Plaintiff's own version of events, neither Defendant Romero nor Defendant Gauna threatened him in anyway, used any physical force, or subjected him to prolonged or repeated questioning.  Because the facts show that Plaintiff consented to the blood test, Plaintiff cannot establish a violation of his constitutional rights arising from the blood test.  Furthermore, Officer Romero is entitled to qualified immunity because it would not have been clear to a reasonable officer that Plaintiff did not give voluntary consent under the circumstances here, where Plaintiff signed a consent form without registering any

18

objection to the blood test and where there were no threats, use of physical force, or prolonged or repeated questioning.

### 2.    Excessive force

Plaintiff alleges in Count II that Defendant Romero used excessive force in compelling him to submit to blood testing against his will.  Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395-97 (1989).  To state a claim of excessive force under the Fourth Amendment, a plaintiff must demonstrate both that a seizure occurred and that the seizure was unreasonable.  *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989); *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994).  The reasonableness of the officer's belief as to the appropriate level of force should be judged from the perspective of an officer on the scene, rather than with the 20/20 vision of hindsight.  *Graham*, 490 U.S. at 396.  The right to make an arrest necessarily carries with it the right to use some degree of physical force to effect it.  *Id.*  Among the factors that courts should consider in determining whether a police officer applied excessive force are (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.  *Id.*

In cases involving claims of both unlawful arrest and excessive force arising from a single encounter, or similarly, for unlawful detention and excessive force claims arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest or detention and the degree of force they used to effect it.  *Cortez v. McCauley*, 478 F.3d 1108, 1127 & n.23 (10th Cir. 2007).  If the plaintiff can prove that the officers lacked probable cause or reasonable suspicion, he is entitled to damages for the unlawful arrest or detention, which includes damages

resulting from any force reasonably employed in effecting the arrest or detention. *Id.* If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest or detention, he is entitled to damages resulting from that excessive force. *Id.* "These two inquiries are separate and independent, though the evidence may overlap." *Id.* at 1127.

In this case, Plaintiff's claim that the administration of the blood test constitutes unconstitutional use of excessive force is negated by his consent – whether this claim is viewed as separate from his unlawful arrest claim or as an extension of that claim. Because Plaintiff consented to the blood draw, he was not "seized" under the Fourth Amendment, and thus, he cannot recover on an excessive force claim if the blood draw is considered a separate incident from the unlawful arrest. Even if the blood draw is considered part of his arrest, because Plaintiff consented to the blood draw, the blood test cannot be deemed unreasonable or excessive. Conducting a blood test to investigate a lawful arrest for DWI is reasonable where the suspect consents to the test. *See* NMSA § 66-8-107 through 66-8-111. Defendants are therefore entitled to summary judgment on Count II.[6]

## B.   Fifth Amendment Claim

In Count IV, Plaintiff asserts a claim under § 1983 for violation of his Fifth Amendment rights.[7] Plaintiff argues that he was not given his *Miranda* warnings at any point from his detention

---

[6]This ruling does not mean that Plaintiff cannot recover damages for the blood draw. "If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest." *Cortez*, 478 F.3d at 1127. If Plaintiff proves that Defendant Romero and Defendant Gauna arrested him without probable cause, he may be entitled to damages he sustained from the blood draw.

[7]Fifth Amendment rights are made applicable to the States by the Fourteenth Amendment. *Chavez v. Martinez*, 538 U.S. 760, 766 (2003).

to his release from jail.  Defendants contend that a failure to give *Miranda* warnings does not subject police officers to § 1983 liability.

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const., amend. V.  "Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs."  *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion) (internal citation omitted).  The failure to give *Miranda* warnings alone thus does not subject police officers to civil liability under § 1983.  *See Chavez*, 538 U.S. at 769 ("mere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness"); *Hannon v. Sanner*, 441 F.3d 635, 636 (8th Cir. 2006) ("[A] litigant cannot maintain an action under § 1983 based on a violation of the *Miranda* safeguards."); *Marshall I*, 345 F.3d at 1165 n.6 ("[V]iolations of *Miranda* rights to do not subject police officers to liability under § 1983."); *Bennett v. Passic*, 545 F.2d 1260, 1263 (10th Cir. 1976) (same).  The remedy for merely failing to provide *Miranda* warnings remains suppression of the evidence in a criminal trial.  *See Bennett*, 545 F.2d at 1263 ("The Miranda decision does not even suggest that police officers who fail to advise an arrested person of his rights are subject to civil liability; it requires, at most, only that any confession made in the absence of such advice of rights be excluded from evidence.").[8]

---

[8]The Court is aware that the Supreme Court in *Dickerson v. United States*, 530 U.S. 428, 444 (2000), held that *Miranda* is a "constitutional rule."  The Supreme Court's decision in *Chavez*, however, precludes any argument that *Dickerson* can be extended to allow a § 1983 civil remedy under the Fifth Amendment for the mere failure to provide *Miranda* warnings.  *See Chavez*, 538 U.S. at 769.  The Tenth Circuit has seemingly rejected this extension as well.  *See Marshall I*, 345 F.3d at 1165 n.6 (rejecting § 1983 claim for violation of *Miranda* rights in post-*Dickerson* case).

Here, the charges against Plaintiff were dismissed and any statements he may have made were never used against him in any criminal prosecution.  Consequently, even assuming that Plaintiff was subject to custodial interrogation without having been given *Miranda* warnings, Defendants are entitled to summary judgment on this claim.  *Cf. Chavez*, 538 U.S. at 767 (determining that plaintiff cannot state § 1983 claim for damages under Fifth Amendment Self-Incrimination Clause based on coercive questioning in absence of *Miranda* warnings where statements were never admitted as testimony against him in criminal case nor was he placed under oath and exposed to self-accusation, perjury, or contempt); *Aguilera v. Baca*, __ F.3d __, 2007 WL 4531990, *8 (9th Cir. Dec. 27, 2007) ("Only after a compelled incriminating statement is used in a criminal proceeding has an accused suffered the requisite constitutional injury for purposes of a § 1983 action."); *Robinson v. Gunja*, 92 Fed.Appx. 624, 627 (10th Cir. Feb. 4, 2004) (unpublished opinion) (holding that plaintiff could not establish § 1983 claim for violation of his right against self-incrimination because he did not allege that any information obtained from monitored calls was used against him in any criminal proceeding).

### C.    Eighth Amendment Claim

Plaintiff alleges in Count VI that Defendants violated his Eighth Amendment rights by failing to provide him medical treatment for his blood pressure and by failing to return his medications following his release from jail.  The Eighth Amendment only applies after the government has secured a formal adjudication of guilt in accordance with due process of law.  *See Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979).  When evaluating the constitutionality of conditions of pretrial detention, the appropriate constitutional provision is the Due Process Clause.  *See id.* at 535-36 & n.16; *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) ("At the time he was

assaulted, appellant was not a convicted prisoner; he was a pretrial detainee.  Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment.").  The alleged denial of medical care arose while Plaintiff was in jail following his arrest, the criminal charges against Plaintiff were later dismissed, and Plaintiff was never convicted of any crime arising from this incident.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.  The Court will, however, analyze Plaintiff's denial of medical care claim under the Due Process Clause.

### D.   Fourteenth Amendment Due Process Claims

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV, § 1. Plaintiff advances several theories in support of his due process claim.

### 1.   False Imprisonment

In Count III, Plaintiff alleges that Defendants violated his Fourteenth Amendment substantive due process rights in arresting and incarcerating him without probable cause.  This claim, however, is covered by the Fourth Amendment and is duplicative of Plaintiff's claim in Count I for unlawful seizure in violation of the Fourth Amendment.  Plaintiff's cause of action must be analyzed under the Fourth Amendment framework, not under the more generalized notion of substantive due process.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) ("Substantive due process analysis is . . . inappropriate . . . if respondents' claim is 'covered by' the Fourth Amendment."); *Graham*, 490 U.S. at 395 (holding that excessive force claims arising from arrest, investigatory stop, or other seizure should be analyzed under Fourth Amendment and its reasonableness standard, rather than under substantive due process approach).  As the Supreme

23

Court explained, "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham*, 490 U.S. at 395.  Defendants are therefore entitled to summary judgment on Count III.

### 2.    Excessive Force

In Count V, Plaintiff alleges a violation of his Fourteenth Amendment substantive due process rights based on the administration of the blood test.  Although the Fourth Amendment governs excessive force claims arising out of a seizure, *see Graham*, 490 U.S. at 395, the Tenth Circuit has analyzed excessive force claims arising outside the context of a seizure under substantive due process principles.  *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) ("Substantive due process analysis is appropriate in cases that involve excessive force where a specific constitutional provision – such as the Fourth or Eighth Amendment – does not apply.").  The standard necessary to show a substantive due process violation is high and is met only where the government actor intended to harm a citizen in some way.  *See Lewis*, 523 U.S. at 852-54.  In determining whether the force was excessive within the meaning of the Fourteenth Amendment, courts must examine three factors:  (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor.  *Roska*, 328 F.3d at 1243.

Here, there is no evidence that Defendants acted maliciously with the sole intent to harm Plaintiff.  Plaintiff consented to the blood test and any injury sustained from the blood test was minimal.  Plaintiff admits he never sought any medical treatment arising from the incident.  The

24

evidence, viewed in the light most favorable to Plaintiff, does not rise to the level of force necessary to support a substantive due process claim as a matter of law.  *Cf. Roska*, 328 F.3d at 1243-44 (affirming dismissal of substantive due process count, even though official pushed girls, because no serious physical injury was inflicted and there was no evidence of malice or other improper motive); *Latta v. Keryte*, 118 F.3d 693, 701-02 (10th Cir. 1997) (concluding that officer was entitled to qualified immunity on due process claim where force was not disproportionate to need, officer was not inspired by malice, and there was no physical injury).  Defendants are therefore entitled to summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim arising from the blood test.

### 3.    Denial of medical care

Plaintiff alleges in Count V that Defendants also violated his Fourteenth Amendment due process rights by failing to provide him medical treatment when he warned them of his fear of suicidal thoughts and by failing to return his high blood pressure medication to him when he was released from jail.  Although pretrial detainees' rights to custodial medical care are protected by the Due Process Clause rather than the Eighth Amendment, courts apply an analysis identical to that applied in Eighth Amendment cases brought under § 1983.  *Olsen*, 312 F.3d at 1315 (quoting *Lopez*, 172 F.3d at 759 n.2).  To state a due process claim for denial of medical care, a plaintiff must show that the defendant's acts or omissions were sufficiently harmful to evidence deliberate indifference to serious medical needs.  *See id.*  Two requirements, one objective and the other subjective, must be satisfied to demonstrate deliberate indifference: (1) the deprivation must be sufficiently serious; and (2) the officer must know of and disregard an excessive risk to the detainee's health or safety. *See id.*

In this case, Plaintiff cannot show deliberate indifference.  It is undisputed that Plaintiff was given his blood pressure medication at the correctional facility.  In addition, Plaintiff asserts that he never told any SRPD officer that he suffered from PTSD or that he was taking psychiatric medications.  Nor has Plaintiff presented evidence that he warned any officer that he was having suicidal thoughts.  The only evidence in the record that could possibly support his denial of medical care claim is that, following his release from the facility, Plaintiff's medication was not returned to him by the employees of the correctional facility.  The employees of the correctional facility, however, are not defendants in this lawsuit.  There is no evidence supporting a claim that any of the named defendants in this case deprived Plaintiff of medical care or knew of and disregarded an excessive risk to Plaintiff's health or safety during his detention or arrest.  Defendants are therefore entitled to summary judgment on Plaintiff's denial of medical care claim.

### E.        Municipal Liability

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dept. of Soc. Servs.*, 43 U.S. 658, 691 (1978).  A municipality also cannot be held liable under § 1983 when there is no underlying constitutional violation by any of its officers.  *Olsen*, 312 F.3d at 1317-18 (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).  When an officer deprives a citizen of a constitutional right, a municipality is liable under § 1983 when its policy or custom inflicts the injury.  *Monell*, 436 U.S. at 694.  A municipality may also be found liable where the failure to train officers amounts to a deliberate indifference to the rights of citizens. *See Olsen*, 312 F.3d at 1318 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).  To establish liability for inadequate training, a plaintiff must show (1) the officers violated a constitutional right; (2) the violation arose under circumstances that constitute a usual and recurring

26

situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training. *Allen v. Muskogee*, 119 F.3d 837, 841-42 (10th Cir 1997). As to the second and third requirements, although a single incident will generally not give rise to liability, a plaintiff can establish deliberate indifference if a violation of federal rights is a highly predictable or plainly obvious consequence of the municipality's failure to train its employees adequately. *See Olsen*, 312 F.3d at 1318 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999)); *Allen*, 119 F.3d at 842. With respect to the fourth factor, the municipal policy must be the moving force behind the violation. *Olsen*, 312 F.3d at 1318.

In Count VII, Plaintiff asserts a municipal liability claim against the City for failing to adequately train its officers. Plaintiff offers two failure-to-train theories. First, Plaintiff asserts that SRPD has no SOPs for the detention and arrests of psychiatrically impaired individuals and that SRPD provided no training in how to recognize such disorders. Plaintiff argues that, had the officers been so trained, Defendant Romero could have recognized some of Plaintiff's behaviors as indicative of PTSD, rather than DWI. Second, Plaintiff argues that SRPD acted with deliberate indifference to the rights of its citizens by failing to adequately train its officers in DWI law and enforcement. The City asserts that it is entitled to summary judgment because neither Officer Romero nor Officer Gauna violated any of Plaintiff's constitutional rights, the record shows the City officers had more than adequate DWI training, and there is no evidence of deliberate indifference to the rights of its citizens. The Court has already determined that questions of fact remain only as to whether Defendant Romero and Defendant Gauna violated Plaintiff's Fourth Amendment rights

27

in detaining and arresting him.  Because the Court has concluded that no other constitutional violations occurred as a matter of law, the Court need only consider Plaintiff's municipal liability claim arising from his Fourth Amendment unlawful seizure claim.

### 1.      PTSD training

Construing the record in Plaintiff's favor, Plaintiff is unable to meet the second, third, and fourth requirements necessary to hold the City liable for inadequate training on arresting psychiatrically impaired individuals.  With respect to the second requirement, Plaintiff has not provided evidence of how common PTSD is or how often its symptoms could easily and reasonably be confused with symptoms of DWI, resulting in an unlawful arrest for DWI.  Plaintiff has thus not shown that the circumstances alleged here constitute a usual and recurring situation with which police officers must deal.

Nor can Plaintiff meet the third requirement.  As an initial matter, Plaintiff has failed to provide evidence that the City had inadequate training regarding arresting psychiatrically impaired persons.  The only pertinent evidence in the record is the statement by former Chief Roybal that he did not recall if there was an SOP in place for the arrest or detention of psychiatrically disabled individuals and that he would have to review the policy to see if there were such a procedure.  *See* Pl.'s Resp., Ex. 11 at 68.  This statement does not definitively establish that there was no procedure in place for detaining, recognizing, and handling psychiatrically disabled citizens.  In any event, even if this statement could be considered evidence of a lack of training on psychiatric disorders, Plaintiff has not shown deliberate indifference on the part of the City.  The record simply cannot support a determination that it was plainly obvious that failing to train officers in the symptoms of PTSD would result in violations of citizens' federal rights.

With regard to the fourth requirement, Plaintiff's evidence does not show that the lack of training directly caused the alleged unconstitutional seizure. Plaintiff has not demonstrated that, had Defendant Romero or Defendant Gauna had training on PTSD, Plaintiff's detention and arrest would have been avoided. Under Plaintiff's own version of the facts, he never told any SRPD officer that he suffered from PTSD or that he was taking psychiatric medications. The only facts in the record that could possibly have indicated a psychiatric disorder are that Plaintiff appeared confused when Defendant Romero asked him some initial questions, he fumbled through his wallet, and he seemed to be talking to himself while doing so. Plaintiff has not established that these acts are readily apparent symptoms of PTSD. Nor has Plaintiff shown that training on PTSD would have allowed Defendant Romero or Defendant Gauna to recognize such symptoms as evidence of PTSD, rather than intoxication or drug use, and would have caused them to not detain or arrest Plaintiff.[9]

Plaintiff relies on the *Olsen* case in support of his municipal liability claim. That case, however, is distinguishable. In *Olsen*, Plaintiff alleged that the municipality was liable for the failure of its officers to provide medical care for his obsessive-compulsive disorder ("OCD"). *See Olsen*, 312 F.3d at 1310-11. In determining that there were disputed material facts that could establish municipal liability based on the municipality's failure to train its officers on OCD, the Tenth Circuit relied on the facts that OCD occurred in 2% of the population, OCD caused marked distress and interference with the person's normal routine, the plaintiff reported his OCD to officers at the jail, he asked for medication because he was having a panic attack, and the officers took away

---

[9]At one point in his response, Plaintiff even asserts that "what Romero may have known about PTSD or any other issue related to West's psychiatric condition and the events of the night of January 3, 2006 is immaterial and irrelevant to the issues on summary judgment." Pl.'s Resp. at 7.

the medication even after he informed them that he needed it.  *See id.* at 1319-20.  In contrast, here Plaintiff did not inform any of the SRPD officers that he had PTSD, and he has not provided evidence on the frequency of occurrence of PTSD in the general population or on how PTSD training would have prevented his arrest.  Unlike the plaintiff in *Olsen*, Plaintiff has failed to meet all the requisite factors to establish municipal liability.

2.       **DWI training**

Plaintiff has also not shown that he can meet the third and fourth requirements necessary to hold the City liable for inadequate DWI training.  With respect to the adequacy of training, SRPD officers were required to obtain 40 hours of training classes from the Department of Public Safety every two years in order to keep their certifications valid.  Defendant Romero received civil rights training at the police academy, he successfully completed training in DWI Standardized Field Sobriety Testing in July 2004, and he received federal civil rights training again in March 2005. Defendant Gauna completed a five-hour course from the Federal Law Enforcement Training Center on drug recognition in July 2002 and attended a DWI symposium in May 2004.  Defendant Romero and Defendant Gauna thus both received DWI training within two years of the incident in this case. Given the training that they were required to undergo, and the DWI training that they in fact completed, it would not have been highly predictable or plainly obvious that the City's failure to require additional in-house DWI training would result in violations of citizens' federal rights.

Plaintiff nevertheless points to the fact that neither officer was familiar with NMSA § 66-8-110, which provides that when the blood or breath of the person tested contains an alcohol concentration of less than four one hundredths, it shall be presumed that the person was not under the influence of intoxicating liquor.  *See* NMSA § 66-8-110(B)(1). This statute, however, describes

the *evidentiary* use of blood alcohol test results.  *See id.  See also State v. Simpson*, 116 N.M. 768,

772, 867 P.2d 1150, 1154 (1993).  The statute does not forbid arresting or bringing a DWI charge

against a person with a BAL less than four one hundredths, and thus, an officer may arrest a person

with a BAL of less than 0.04, if the officer has probable cause to believe, based on the totality of the

evidence, that the person was driving under the influence of intoxicating liquor or drugs.  Therefore,

even if the City failed to train their officers on the meaning of this statute, it is not plainly obvious

that such a failure would directly result in unconstitutional seizures.

Plaintiff also cannot meet the causation requirement.  The officers did not know Plaintiff's

BAL until after they arrested him and subjected him to a breath test.  Knowledge of the statute

would thus not have prevented his initial detention and arrest.  The only injury that it may have

prevented was his continued detention and the filing of the DWI charge against him.  The undisputed

evidence demonstrates, however, that the officers subjected him to a blood test in order to test also

for drugs, the results of which were not discovered until after Plaintiff was released from jail.

Training on the evidentiary presumption for alcohol would not have prevented the officers from

charging Plaintiff with driving under the influence of drugs.  Plaintiff has therefore failed to

establish that the alleged constitutional violation would have been avoided if the officers had been

trained on the statutory evidentiary presumption contained in NMSA § 66-8-110(B)(1).  *Cf. Carr*

*v. Castle*, 337 F.3d 1221, 1231-32 (10th Cir. 2003) (holding that plaintiff had not demonstrated how

inadequacy of training directly caused officers' allegedly unconstitutional actions).

After construing the evidence in the light most favorable to Plaintiff, the Court concludes

that the evidence is insufficient to demonstrate that the City acted with deliberate indifference.  The

City is therefore entitled to summary judgment on Plaintiff's municipal liability claim alleged in

Count VII.

    **F.**    **State Law Claims**

Defendants do not argue in their motion that they are entitled to summary judgment on the state claims contained in Count VIII, and thus, the Court will not address the merits of these claims.


**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 36) is **GRANTED** in part and **DENIED** in part.  Defendants' motion for summary judgment is **GRANTED** as to Counts II, III, IV, V, VI, and VII.  Defendants' motion for summary judgment is **DENIED** as to Count I.

 

_____

SENIOR UNITED STATES DISTRICT JUDGE